Filed 9/27/18

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| THE PEOPLE, | B281816 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA085329) |
| v. | |
| STEVEN EDWARD FLEMING, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County.  Michael D. Carter, Judge.  Reversed.

Eric S. Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb and Kathy S. Pomerantz, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

Steven Edward Fleming appeals the judgment entered following a jury trial in which he was convicted of one count of second degree murder.[1]  (Pen. Code,[2] §§ 187, subd. (a), 189.)  The jury found true firearm enhancement allegations pursuant to section 12022.53, subdivisions (b) through (e)(1), and a gang enhancement allegation pursuant to section 186.22, subdivision (b)(1)(C).  The trial court denied probation and sentenced appellant to state prison for an aggregate term of 40 years to life.

Appellant contends the trial court's erroneous response to a jury question during deliberations allowed the jury to convict appellant of murder for conduct that, as a matter of law, constituted no more than accessory after the fact.  We conclude that the trial court's response to the jury's inquiry misdirected the jury on the law and thus constituted an abuse of discretion.  The erroneous instruction was prejudicial, and we therefore reverse.[3]

---

[1] Appellant's first trial on a charge of first degree murder and firearm and gang enhancement allegations resulted in a mistrial after the jury acquitted appellant of first degree and deadlocked as to second degree murder.

Codefendant Scott Lewis King was also charged in count 1 with first degree murder.  Appellant's and King's cases were severed for trial, and King has separately appealed his conviction in case No. B288298.

[2] Undesignated statutory references are to the Penal Code.

[3] Because the trial court's error requires reversal of the conviction, we do not reach appellant's remaining contentions.

# FACTUAL BACKGROUND

1. *Marvin Laguan's murder*

On August 22, 2011, around 9:00 p.m. Cynthia drove to Mar Vista Avenue in Pasadena to pick up her boyfriend, Marvin Laguan, at his friends' house. With her three-year-old son in the backseat, Cynthia remained in the car as Laguan came out of the house and spoke with her at the driver's side window. Laguan told Cynthia he was going to go back inside to say goodbye to his friends. At this point, Cynthia noticed an African-American male wearing a black sweatshirt with the hood over his head walking by and looking in Laguan's direction.

Laguan went over to the person who had stopped about 15 feet away and challenged him, saying, "What are you staring at?" "Where are you from?" The man responded he was "PDL" and opened fire on Laguan. Cynthia heard "a lot" of gunshots, and one shot hit the left end of her car. The shooter then ran down the street toward Maple Avenue.

After the shooting Cynthia identified Scott King from a photographic lineup as the shooter, and described the gun he used as a revolver. She did not see appellant on the night of the shooting, nor did she see anyone else walking by her car, standing on the street nearby, or running with King.

That night around 10:00 p.m., Oliver and Nicole were sitting on the front porch of their house on Mar Vista Avenue when they heard gunshots nearby. They saw two African-American men running past their house heading south on Mar Vista Avenue. One was running slightly ahead of the other. By the time they reached the corner, they were running together. Both men turned right and continued running on Maple Avenue.

3

Laguan suffered 10 gunshot wounds to his body, two of which were fatal. Five projectiles, consistent with the .22 long rifle caliber ammunition used in 10-round revolvers, were recovered from Laguan's body.

### 2. Appellant secures a ride home

After the shooting appellant called his mother Alanda, and asked her to pick him up at the home of his close friend, Brandi Rigdell, on Wilson Avenue in Pasadena. Alanda arrived to find Brandi's street blocked off by police vehicles.[4] A police officer told Alanda there had been a shooting, and her son would have to come out and meet her on the corner. Alanda called Brandi and told her to have appellant meet Alanda at her car.

Appellant came out of Brandi's apartment with King and appellant's best friend, Maurice Scudder. They crossed the street and all three got into Alanda's car, which was parked on Villa Street. Alanda dropped King off and drove appellant and Scudder back to her house. Both appellant and Scudder were quiet, but neither appeared to be nervous.

### 3. Appellant's trial testimony and statements to police[5]

Appellant was 18 years old in August 2011, and 12 years old when he and King were jumped into the Pasadena Denver Lanes ("PDL") gang by fighting each other. Appellant got his

---

[4] Brandi's apartment was on Wilson Avenue between Maple Avenue and Villa Street. Marvin Laguan was shot one block to the east, on Mar Vista Avenue between Maple and Villa.

[5] Appellant's January 18, 2012 recorded interview was played for the jury. Appellant also testified in both trials, and the People read his testimony from the first trial to the jury.

first gang-related tattoo—"PDL" on his wrist—in January or February 2011.

On August 20, 2011, two days before Laguan's murder, appellant learned that King's cousin Wilson Pierre had been murdered. The "word on the street" was that Pierre had been killed by a member of a rival Crip gang. Pierre was a member of a PDL clique, the Project Gangster Bloods. Appellant sent King a private Facebook message telling him about Pierre's death. He also posted to Facebook, "Lanes in peace to the home. Wilson gone but never forgotten," and joined the Facebook group "R.I.P. Wilson Pierre." King told appellant he was "hurt and upset" about Pierre's death, but did not indicate he intended to seek revenge for the murder. For his part, appellant had only met Pierre a couple of times, and had no interest in retaliating for his death.

On the day of the shooting, appellant, King, and Scudder walked to La Pintoresca Park to play basketball. While they were changing their clothes, appellant saw a gun that looked like a .22 caliber revolver in King's belongings. It was the first time appellant had ever seen King with a gun, and he asked King why he had it. King responded that it was "for his own personal business." Appellant told police that King needed a gun for protection. King was "pretty upset" about Pierre's death, and appellant counseled him not to retaliate.

When they finished playing basketball, the three men went to Brandi's apartment where they were joined by Ricky Vaughns. After a while appellant, King, Scudder, and Vaughns all went to King's cousin's house on Mar Vista Avenue north of Villa Street. King went inside for 15 to 20 minutes while the others waited outside. King rejoined the others, and the four men started

5

walking south on Mar Vista Avenue back toward Brandi's apartment. When they reached Villa Street, King told appellant he wanted to talk to him alone, and told Scudder and Vaughns to leave. Scudder and Vaughns turned west on Villa Street[6] while appellant and King continued walking south on Mar Vista Avenue. Appellant insisted to police he did not know why King wanted to go down Mar Vista, but admitted that "[i]t felt like something was going to happen."

As they walked down Mar Vista Avenue, appellant was on the sidewalk on the west side of the street and King was about six or seven feet away,[7] "in the street sort of." King seemed stressed out, and asked appellant for advice on what he should do about his girlfriend's pregnancy. At some point, King told appellant he wanted to bang on the first person he saw,[8] which appellant testified could mean King would be "checking whoever was in his way" to find out who the person was, or, as appellant explained to police, meant that King was "going to start some trouble." Appellant told police that "trouble" "could mean life or death or you are going to fight." But appellant testified that if he

---

[6] Surveillance video from a market on the corner of Villa Street and Mar Vista Avenue showed that Scudder and Vaughns did not leave the area when appellant and King separated from them.

[7] In the second trial appellant testified that he and King were 15 feet apart as they walked down the street.

[8] Appellant denied this statement by King in the second trial. When asked about his prior testimony, appellant explained that he had been "coerced into saying some things."

had thought it was King's intention to kill someone that night, he would not have gone with him.

Appellant saw Laguan standing at the driver's side of a white car on the west side of the street. As appellant walked past the car, Laguan looked at appellant and they acknowledged each other with a nod of their heads. When appellant reached the corner, he saw Laguan approach King and say, "What are you looking at, fool? Where you from?" King responded, " 'P.D.L.,' " and reached toward his waistband. Appellant got scared and ran away. He did not see what happened next, but heard gunshots, and continued running until he reached Brandi's apartment.

King caught up to appellant as he ran, and they reached Brandi's apartment about the same time as Scudder. In the first trial appellant testified that when they reached Brandi's apartment King was holding a gun, which appellant recognized as the same gun he had seen earlier in the day at the park. Appellant asked King why he had shot Laguan, but King did not answer and ran to the bathroom. There King emptied the chamber of the gun into the toilet. King did not have the gun when he came out of the bathroom, and appellant did not know what he had done with it. While appellant testified in the second trial that he never saw the weapon at Brandi's apartment at all, he admitted to police that he saw King hide the gun behind the oven. Before leaving the apartment King changed his clothes and ordered appellant to do the same. Appellant did so because he was nervous and afraid.

Appellant, King, and Scudder left Brandi's apartment together and walked to the corner of Wilson Avenue and Villa Street, where Alanda was parked. All three got into the car, even though appellant had not offered a ride to King and was

uncomfortable with King in the car. Appellant asked King if he still had the gun. King said no, he had put it in a safe place.

A few weeks later Vaughns called appellant and asked him to help retrieve the gun from Brandi's apartment for King. Appellant testified that Vaughns drove to the apartment, and appellant stayed in the car while Vaughns went inside. But appellant told police that he and Vaughns had gone inside the apartment and retrieved the gun from behind the stove together. They brought the gun to King. The weapon was intact, and appeared to be the same gun appellant had seen in King's possession on the day of Laguan's murder.

Appellant told police that he believed King had shot Laguan because King was angry and upset about Pierre's murder. But he insisted that Laguan's murder was not planned.

4. *Scudder's police interview and testimony from the first trial*[9]

On the night of the shooting, Scudder met up with appellant, King, and Vaughns at King's cousin's house on Mar Vista Avenue near Villa Street. After leaving the cousin's house, they walked down Mar Vista together, but when they reached Villa Street, appellant told Scudder, "Just go to Brandy's [*sic*] house. We going to come over there. I'll meet you over there. We're about to go do something." Appellant and King proceeded down Mar Vista Avenue, leaving Scudder and Vaughns behind on

---

[9] The trial court found Scudder was unavailable to testify, and allowed the prosecutor to read Scudder's testimony from the first trial to the jury. The recording of Scudder's January 26, 2012 interview with police was also played to the jury.

8

Villa Street. Hearing what sounded like gunshots four or five minutes later, Scudder ran to Brandi's apartment. Appellant and King arrived at the apartment about three minutes after Scudder.

Appellant and King immediately ran to a back room and closed the door. Scudder went to the room and saw both men rushing in and out of the bathroom. The gun was in several pieces, and Scudder guessed it must have been a revolver because it had been taken apart. Scudder saw King pass the cylinder to appellant, but did not see anyone take the gun or any of its pieces out of the room or hide anything in the apartment.

5. *Gang evidence*

Corporal Carlo Montiglio of the Pasadena Police Department testified as the prosecution's gang expert. The PDL gang began in the late 1970's. By 2011, with hundreds of active members, it was the largest criminal street gang in Pasadena.[10]

Montiglio testified that PDL is a Blood gang, and its membership is predominantly African-American. In addition to the deep rooted rivalry between Crip and Blood gangs in general, there is a fierce and long-standing rivalry between Pasadena's African-American and Hispanic gangs. PDL's rivals in Pasadena include the Villa Boys Pasadena Trece gang ("Villa Boys") and

---

[10] Montiglio testified about the gang's primary criminal activities and described two predicate acts committed by documented PDL gang members. One was a murder committed by Dwayne Rice in 2009, and the other was a robbery and attempted robbery committed by King in 2010. Montiglio opined that both Rice and King were members of PDL at the time of their offenses.

the Varrio Rifa Pasadena gang ("VRP"). In 2011, PDL was engaged in gang wars with the Villa Boys and VRP. Montiglio described the boundaries of the territory claimed by PDL, and testified that the rival Villa Boys gang claimed the area of Mar Vista Avenue between Villa Street and Maple Avenue as part of its territory. According to the expert, the mere presence of a gang member in the territory claimed by a rival gang often results in violent conflict.

Montiglio explained that it is extremely important for a gang to seek revenge for the murder of one of its members. But retaliation for a gang member's murder is not limited to killing the person responsible for the murder or even going after another member of the responsible gang. Rather, a gang may retaliate for the murder of one of its own by killing a member of some other gang or even someone with no gang affiliation. This sort of revenge benefits the gang because it demonstrates the gang's willingness to commit violence, which sows fear in the community and among rival gangs, thereby enhancing the gang's status.

Montiglio explained that in gang parlance, to "bang" refers to intimidation or violence committed by a gang member. According to Montiglio, "banging" or "gangbanging" may consist of verbal threats and intimidation, and can include assault on a rival with fists, shooting a rival, wounding a rival, or killing a rival. Montiglio opined that when a gang member who is upset about a rival says he wants to "bang on" the first person he sees and goes into rival gang territory armed with a firearm, "bang" in that context refers to carrying out an act of violence.

Montiglio testified that gang members frequently commit shootings in pairs or groups, which allows for a division of labor and helps to avoid apprehension. For example, while one person

10

is the shooter, another may be the getaway driver, still another provides a distraction, and someone else serves as a lookout for police.

Based on his review of departmental resources, field identification cards, and photographs of appellant's and King's gang tattoos, gang clothing, and gang hand signs, Montiglio opined that both men were members of PDL at the time of the Laguan murder. In addition, Montiglio opined that Brandi and Vaughns were associates of PDL, based on photographs of them flashing gang hand signs. Scudder also appeared in many of these pictures.

When presented with a hypothetical scenario based on the facts of the Laguan murder, Montiglio opined that the murder was committed for the benefit of, and in association with, the PDL gang.

## DISCUSSION

### I. The Trial Court's Response to the Jury Question During Deliberations

In both trials, the court instructed the jury with CALCRIM No. 401, which provides in relevant part:

"To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

"1. The perpetrator committed the crime;

"2. The defendant knew that the perpetrator intended to commit the crime;

"3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and

11

"4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime."

In both trials, the jury asked at what point the commission of the crime ended for purposes of aiding and abetting liability. Despite the similarity of the juries' questions, however, the trial court responded differently in each case.[11] Appellant contends that the court abused its discretion in responding to the jury question in the second trial, because it led the jury to convict appellant of murder based on a legally invalid theory. We agree.

### A. Relevant proceedings

#### 1. The jury question and the trial court's response in the first trial

Appellant's first trial resulted in an acquittal on the charge of first degree murder, and the jury deadlocked as to second degree murder. Shortly after deliberations in the first trial had commenced, the jury submitted its first question:

"When did the actual crime addressed end? Do the actions at Brandi's house after the murder, securing safe passage, and retrieving the weapon, constitute the timeframe of the crime? We need more insight on this and the laws of aiding and abetting."

The trial court responded in writing:

"Please see jury instruction [CALCRIM No.] 401, #3.

"The defendant's *intent* to aid and abet must be formed prior to or during the commission of the crime.

---

[11] Judge Michael D. Carter presided over both trials, and the prosecutor in both trials was Deputy District Attorney Stefan Mrakich. Appellant was represented by a different attorney in each trial.

12

"The crime of Assault is completed when the shooting has completed.

"However, among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense."[12]

> 2.  *The jury question and the trial court's response in the second trial*

During deliberations in the second trial, the jury submitted a question which raised exactly the same issue as the jury's question in the first trial:

"Are the events that take place after the crime considered part of the committing?  For example the alleged disposal of the weapon and securing the ride home?  (In the case of aiding/abetting)  When does the crime end?  After the last shot or when safe harbor occurs?"

Before discussing the question with the parties, the trial court requested clarification of the question from the jury:

---

[12] When deliberations resumed on the next court date, the jury submitted Question No. 3, which again sought clarification as to when the crime ended.  The wording of Question No. 3 varied only slightly from Question No. 1:

"When did the actual crime addressed end?  Due [*sic*] the actions at Brandi's house after the murder constitute the timeline of the crime?  We need clarification on this in regards to aiding and abetting."

The trial court gave the identical written response it had given to Question No. 1.

"The jury is asking to define the word 'committing'. [¶] Which particular instruction or instructions is the jury referring to when asking about the word 'committing'?" The jury responded, "[CALCRIM No.] 401—in particular, part 3."

In the discussion with counsel that followed, the trial court treated the jury's question as two separate queries: one seeking guidance as to whether the jury could consider evidence of defendant's conduct after the shooting in determining guilt based on aiding and abetting, and the other about the point at which the crime ends. After conferring with the parties, the trial court provided a written response to the jury's question, which omitted any guidance about when the commission of the crime came to an end: "Factors relevant to the determination of whether defendant is guilty of aiding and abetting include but are not limited to presence at the scene of the crime, companionship, and conduct before and after the offense." Later that day the jury reached its verdict convicting appellant of second degree murder and finding the gang and firearm allegations true.

### B.    *Appellant did not forfeit the issue*

Respondent asserts that after consultation with the court, defense counsel approved the court's proposed response to the jury's question, and thereby forfeited any challenge to the court's reply. However, the record reveals a spirited discussion between the court and parties during which defense counsel unsuccessfully argued that the thrust of the jury's question required guidance on the distinction between the different mental states involved in aiding and abetting versus accessory-after-the-fact. Counsel's ultimate acquiescence in the trial court's interpretation of the jury's question did not forfeit appellant's challenge to the court's response to the jury.

14

The trial court and defense counsel fundamentally disagreed over the focus of the jury's inquiry. Defense counsel took issue with the court's interpretation of the question as a request for guidance as to whether the jury could consider evidence of defendant's conduct after the shooting in determining his intent. Focusing on the jury's question about what acts are part of the commission of the offense, counsel argued that aiding and abetting requires proof of a different mental state than that required for liability as an accessory. Specifically, knowing of the perpetrator's unlawful purpose, the aider and abettor " 'specifically intends to, and does in fact, aid, facilitate, promote, encourage or instigate the perpetrator's *commission* of that crime.' " (Italics added.)

The trial court countered that the thrust of the question was whether the jury could consider the events that occurred after the shooting in determining whether the defendant *intended* to aid and abet the crime. Thus rejecting defense counsel's analysis and accepting the prosecutor's proposal,[13] the court announced that it would answer the jury by quoting from the case law, and offered the parties an opportunity to present further argument to the jury.

---

[13] The prosecutor urged the court to respond to the jury's question with the following quote from *People v. Singleton* (1987) 196 Cal.App.3d 488, 492: " 'Factors relevant to a determination of whether defendant was guilty of aiding and abetting include[:] presence at the scene of the crime, companionship, [and] conduct before and after the offense.' " (See also *People v. Chagolla* (1983) 144 Cal.App.3d 422, 429.)

15

On this record, we must reject respondent's forfeiture argument. " 'An attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections or motions, does not waive the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation for which he was not responsible.' " (*People v. Calio* (1986) 42 Cal.3d 639, 643; *State Compensation Ins. Fund v. Superior Court* (2010) 184 Cal.App.4th 1124, 1129 ["the law is clear that '[p]arties do *not* waive error by "acquiescence" when they object to trial court error and then take "defensive" action to lessen the impact' "].) By acquiescing in the trial court's interpretation of the jury's question after arguing for a different analysis and response, defense counsel did not forfeit an appellate challenge to the response the court gave.

### C. *The trial court abused its discretion in its response to the jury's question*

As in appellant's first trial, the jury in this case asked whether the *commission of the crime* included events that occurred *after the shooting* (i.e., disposal of the weapon and securing the ride). Specifically, for purposes of determining appellant's liability as an aider and abettor, the jury asked the court: "When does the crime end? After the last shot or when safe harbor occurs?" However, in contrast to appellant's first trial, in the second trial the trial court did not answer this question. Instead, based on the jury's reference to paragraph no. 3 of CALCRIM No. 401,[14] the court responded to a different

---

[14] Paragraph no. 3 of CALCRIM No. 401 requires the jury to find that, "[b]efore or during the commission of the crime," the

question that the jury had not asked:  what factors may the jury consider in determining whether the defendant is guilty of aiding and abetting?  While the court's response to that question was technically a correct statement of the law, as a response to the jury's specific request for clarification as to what acts can be considered to be part of the *commission* of the crime, the answer did not correctly instruct the jury on the point of law that was the subject of the query.

"An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury."  (*People v. Waidla* (2000) 22 Cal.4th 690, 745–746.)  However, "[w]e review de novo the legal accuracy of any supplemental instructions provided."  (*People v. Franklin* (2018) 21 Cal.App.5th 881, 887, fn. omitted; *People v. Posey* (2004) 32 Cal.4th 193, 218.)  Under the circumstances here, we conclude the trial court's response misdirected the jury on the law and thus constituted an abuse of discretion.

"The court has a primary duty to help the jury understand the legal principles it is asked to apply."  (*People v. Beardslee* (1991) 53 Cal.3d 68, 97 (*Beardslee*).)  During jury deliberations "when the jury 'desire[s] to be informed on any point of law arising in the case . . . the information required must be given.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 97, quoting § 1138.) "However, '[w]here the original instructions are themselves full and complete, the court has discretion under section 1138 to

_____

defendant formed the intent to commit and "aid and abet the perpetrator in committing the crime."

17

determine what additional explanations are sufficient to satisfy the jury's request for information.' " (*Ibid*.)  Although the trial court need not always elaborate on the standard instructions, the trial court nevertheless has "a ' "mandatory" duty to clear up any instructional confusion expressed by the jury.'  (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212, superseded by statute on another ground.)" (*People v. Loza* (2012) 207 Cal.App.4th 332, 355; see also *People v. Boyce* (2014) 59 Cal.4th 672, 699.)  This means that a trial court's response to a jury question can be erroneous even if it does not technically misstate the law.  (See *People v. Nero* (2010) 181 Cal.App.4th 504, 518 [trial court misinstructed the jury by rereading two instructions in response to jury's questions which had demonstrated confusion and specifically sought clarification of those instructions]; *People v. Solis* (2001) 90 Cal.App.4th 1002, 1015 [" '[a] definition of a commonly used term may nevertheless be required if the jury exhibits confusion over the term's meaning' "].)

Our Supreme Court has declared that "if a defendant's liability for an offense is predicated upon the theory that he or she aided and abetted the perpetrator, the defendant's intent to encourage or facilitate the actions of the perpetrator 'must be formed *prior to or during* "commission" of that offense.' " (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039.)  "Because the aider and abettor is subject to the same criminal liability and the same potential punishment as the perpetrator, it is essential to distinguish the act and intent that constitute 'aiding and abetting' the commission of a crime, from conduct that will incur the lesser liability of an 'accessory' to the crime—defined as conduct by one who, '*after a felony has been committed*, . . . aids a principal in such felony, with the intent that said principal may

18

avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony.' " (*Ibid.*)

Here, the jury was instructed under the natural and probable consequences doctrine:  in order to find appellant guilty of murder, the jury first had to decide whether appellant perpetrated or aided and abetted an assault with a firearm, a simple assault, or a battery, and then if murder was a natural and probable consequence of that crime.  (CALCRIM No. 403.) Significantly, none of these crimes continues until the perpetrator reaches a place of temporary safety.  Rather, an assault is complete once the violence that would complete the battery is commenced.  (*People v. Colantuono* (1994) 7 Cal.4th 206, 216 ["An assault is an incipient or inchoate battery; a battery is a consummated assault"]; *People v. Yslas* (1865) 27 Cal. 630, 633; see also *People v. Chance* (2008) 44 Cal.4th 1164, 1170 [" '[a]n assault occurs whenever " '[t]he next movement would, *at least to all appearance*, complete the battery' " ' "].)  A battery is complete when the "willful and unlawful use of force or violence" occurs (§ 242), and a " 'murder ends with the death of the victim.' " (*People v. Celis* (2006) 141 Cal.App.4th 466, 471; *People v. Esquivel* (1994) 28 Cal.App.4th 1386, 1397.)

The jury's question in this case leaves no room for doubt as to the source of the jury's confusion:  if appellant could be guilty of the murder only if he formed the intent to commit or aid and abet the crime *before* or *during* its commission, the jury needed to know how long the commission of the crime continued—until the last shot was fired, or when the perpetrator had reached a place of safety?  None of the instructions given addressed this point. But by purporting to answer this question by telling the jury to

consider appellant's conduct *after* the offense, the court essentially told the jury that the commission of the crime was still ongoing when appellant and King reached Brandi's apartment, and thus included appellant's acts of disposing of the gun and securing a ride home. As a response to the question the jury actually asked, this answer was wrong: it failed to clarify for the jury that, for purposes of determining *when* appellant formed his intent, the crime was complete when the last shots were fired, and it authorized a conviction for murder even if the jury found appellant formed the requisite intent and rendered aid only *after* the commission of the crime. (See *People v. Loza*, *supra*, 207 Cal.App.4th at p. 355.) By failing to answer directly the jury's question about how long the commission of the crime continued, the court improperly burdened the jury with the responsibility for deciding a question of law that was the court's duty to answer. (See *In re Richardson* (2011) 196 Cal.App.4th 647, 652 [question of what constitutes great bodily injury under the Three Strikes law is a question of law for the court, not the jury, to decide]; *Sparf v. United States* (1895) 156 U.S. 51, 78 ["under the Constitution of the United States, juries in criminal cases have not the right to decide any question of law"].) The response here violated the trial court's mandatory duty to help the jury understand the legal principles involved in the case. (*Beardslee*, *supra*, 53 Cal.3d at p. 97; *People v. Moore* (1996) 44 Cal.App.4th 1323, 1332.)

### D. *The erroneous instruction was prejudicial*

A violation of section 1138 warrants reversal only upon a showing of prejudice. (*Beardslee*, *supra*, 53 Cal.3d at p. 97.) The parties disagree regarding the applicable standard for assessing prejudice. In general, a trial court's failure to adequately answer

20

a jury's question during deliberations is subject to prejudice analysis under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Roberts* (1992) 2 Cal.4th 271, 326.) "That standard requires us to evaluate whether the defendant has demonstrated that it is ' "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*People v. Gonzalez* (2018) 5 Cal.5th 186, 195.) In this context our Supreme Court has made clear that a reasonable probability " ' " 'does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' " ' " (*People v. Wilkins* (2013) 56 Cal.4th 333, 351; *People v. Eid* (2010) 187 Cal.App.4th 859, 882.)

On the other hand, "[a]n instruction that omits or misdescribes an element of a charged offense violates the right to jury trial guaranteed by our federal Constitution, and the effect of this violation is measured against the harmless error test of *Chapman v. California* (1967) 386 U.S. 18, 24." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165; *People v. Nero, supra,* 181 Cal.App.4th at pp. 518–519.) Under the *Chapman* standard, we determine "whether beyond a reasonable doubt the jury verdict would have been the same absent the error." (*People v. Nero, supra*, at p. 519; *People v. Gonzalez, supra*, 5 Cal.5th at p. 196.)

Here, we find the trial court's erroneous response to the jury's inquiry about the duration of the crime for purposes of aider and abettor liability was prejudicial under either the *Chapman* or *Watson* standard.

Respondent asserts that the error was harmless because "overwhelming and credible evidence showed that appellant knew that King intended to commit a crime that night." This

21

argument is beside the point. While the defendant's knowledge of the perpetrator's intent to commit the crime is one of the elements of aiding and abetting (CALCRIM No. 401 ¶ 2), the jury's question made plain it was focused on a different element: the formation of intent before or during the commission of the crime to aid and abet the perpetrator in committing the crime. (CALCRIM No. 401 ¶ 3.) As the trial court noted, the jury could not even reach the issue of appellant's intent unless it first found he had knowledge of King's intent to commit a crime.

In this regard, we reiterate that appellant's burden here is to demonstrate a reasonable probability that a more favorable result would have been reached in the absence of the error (*People v. Gonzalez, supra*, 5 Cal.5th at p. 195), not that his conviction was based on insufficient evidence. (*In re Martinez* (2017) 3 Cal.5th 1216, 1224.) Indeed, where the court errs in instructing the jury "on correct and incorrect theories of liability, the presumption is that the error affected the judgment: ' "Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law— whether, for example, the action . . . fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error." ' (*People v Guiton* (1993) 4 Cal.4th 1116, 1125, quoting *Griffin v. United States* (1991) 502 U.S. 46, 59.)" (*In re Martinez, supra*, 3 Cal.5th at p. 1224.)

The Attorney General also contends that the prosecutor's argument to the jury correctly enforced the idea that the jury could consider appellant's conduct after the shooting to determine

his intent to aid and abet before the crime. "They both fled together after the crime. They both disposed of the weapon after the crime, and [appellant] secured safe passage. You can look at the conduct before, during, and after to get to [appellant's] intent; and the evidence is overwhelming that at a minimum he intended to aid and abet an assault." However, this argument, focusing on appellant's conduct after the crime, did not answer the jury's question about *when* commission of the crime ended. Because the court's response informed the jury the crime continued beyond the shooting, the prosecutor's argument could not render the court's subsequent misdirection on this critical issue harmless.

We cannot ignore the fact that when the court correctly responded to the jury's question in the first trial—"The crime of assault is completed when the shooting has completed"—the result was a hung jury and a mistrial. In the second trial, where the court purported to answer the same question—"When does the crime end?"—with reference to appellant's conduct after the shooting, the result was a conviction for second degree murder based on aiding and abetting. Clearly the result of the first trial was more favorable to appellant than the result on retrial. (*People v. Soojian* (2010) 190 Cal.App.4th 491, 520 ["under the *Watson* standard a hung jury is considered a more favorable result than a guilty verdict"].) This disparity of outcomes strongly suggests that the court's instructional error in the second trial was prejudicial. (*People v. Ogunmola* (1985) 39 Cal.3d 120, 124–125 [while such a different result is "far from conclusive, it is a great deal more probative and convincing than the usual tools given to appellate courts on the issue of prejudice"]; see also *People v. Soojian*, *supra*, at p. 520 and cases

23

cited therein ["Other cases have found it persuasive that the first trial ended in a hung jury when deciding whether the error that occurred in the retrial was prejudicial"].)

Finally, "if jury instructions are important in general, there is no category of instructional error more prejudicial than when the trial judge makes a mistake in responding to a jury's inquiry during deliberations." (*People v. Thompkins* (1987) 195 Cal.App.3d 244, 252–253.) And where that mistake misdirects a jury on the law allowing it to convict on an invalid theory, reversal is required. (*People v. Chiu* (2014) 59 Cal.4th 155, 167; *People v. Chun* (2009) 45 Cal.4th 1172, 1201.) Here, because the trial court's instruction allowed the jury to convict appellant for second degree murder even if it found he formed the requisite intent *after* the commission of the crime, the erroneous response to the jury's inquiry was prejudicial, requiring reversal.

## DISPOSITION

The judgment is reversed.

CERTIFIED FOR PUBLICATION.


LUI, P. J.

We concur:



ASHMANN-GERST, J.



HOFFSTADT, J.


24