Filed 3/26/24  P. v. Molina CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C097923 |
| Plaintiff and Respondent, | (Super. Ct. No. 21FE016518) |
| v. | |
| JORGE ENRIQUE MARTINEZ MOLINA, | |
| Defendant and Appellant. | |

In the early morning hours of September 25, 2021, defendant Jorge Enrique Martinez Molina entered the house of his former wife, R.D.  R.D. woke up to find defendant standing next to her bed.  Defendant pointed his gun at R.D.'s head and then put it on the nightstand.  He attempted to have sex with her, inserted his fingers in her vagina, and orally copulated her.

A jury found defendant guilty of assault with intent to commit rape, forcible sexual penetration, forcible oral copulation, and assault with a firearm, and found true enhancement allegations that defendant personally used a firearm.  The trial court

1

sentenced defendant to 30 years to life in prison plus 16 years. On appeal, defendant contends the trial court prejudicially erred by providing a misleading and nonresponsive answer to a question submitted by the jury during deliberations relevant to the forcible oral copulation count, requiring reversal of that count. We disagree and will affirm.

## BACKGROUND

A second amended information charged defendant with assault with intent to commit rape (Pen. Code, § 220; count one),[1] forcible sexual penetration (§ 289, subd. (a)(1); count two), forcible oral copulation (§ 287, subd. (c)(2)(A); count three), and assault with a firearm (§ 245, subd. (a)(2); count four). In connection with counts one through three, the information alleged defendant personally used a firearm. (§ 12022.53, subd. (b).) The information also alleged five aggravating circumstances. (Cal. Rules of Court, rule 4.421(a)(1), (2), (8), (11), (b)(1).)

### *The Prosecution Case*

R.D. had been married to defendant for 10 years and they had two children together. They divorced in 2010, but, after a few months, they got back together for another four or five years. When defendant, who was in the National Guard, deployed, R.D. and defendant ended their relationship. Upon his return in November 2020, defendant told R.D. he wanted to work things out and R.D. agreed. The reconciliation lasted a few months, but R.D. asked him to move out in June 2021.

By this time, the relationship had grown complicated. Defendant wanted to know where R.D. was at all times and with whom she was spending time. After he moved out, he retained a key to the house. In July 2021, R.D. found an AirTag tracking device in her purse. She confronted defendant about the AirTag, but defendant "denied everything . . . ." According to the parties' daughter, defendant denied the AirTag was

---

[1] Undesignated section references are to the Penal Code.

his, yet he asked to have it back. R.D. found another AirTag under the carpet of her truck behind the gas pedal. She had allowed defendant to borrow the truck, and no one else had access to it.

Defendant and R.D. had consensual sex for the last time on September 15, 2021. R.D. suggested the possibility of getting remarried, and that is when she discovered defendant was engaged to another woman. R.D. grew upset. Later that day, R.D. texted defendant, "I hate you. You make me feel like . . . I'm not worth nothing."

On September 25, 2021, R.D. went out dancing. Defendant sent R.D. text messages telling her to "come get his gun." He later sent her a text message stating he was going to her apartment. R.D. did not respond to defendant's texts or answer his calls and eventually blocked his number.

R.D. arrived at home at 3:00 or 4:00 in the morning. She checked the street for defendant's car but did not see it. She turned off the light in her room and went to bed.

Within an hour, R.D. awoke because the light was on. She saw defendant standing next to her bed. Defendant asked her where she had been, who she had been with, and who she went out to have sex with. R.D. told him to leave.

Defendant pulled a gun from behind his back. He grabbed R.D.'s hands, climbed on top of her, and pointed the gun at her head. Defendant said he was being deployed and "he had to fuck [her] one more time before he left." R.D. said no, told defendant she did not want to have sex with him, and told him to stop. Defendant placed his gun on the nightstand and started pulling down R.D.'s pajama bottoms, eventually getting them off. She continued telling him to stop. Defendant told R.D. she was going to be with him and he would kill anybody that got close to her. He started pulling his pants down. Subsequently, he tried to take off R.D.'s pajama shirt. Defendant again climbed on top of R.D., grabbed his gun, and pointed it at her head.

Defendant tried to have sex with R.D., but he was not able to, so he put two fingers in her vagina. Initially, R.D. testified she did not remember if defendant also put

3

his mouth on her vagina. However, after she refreshed her recollection with a police report, she remembered defendant putting his mouth on her vagina. She testified defendant performed oral sex on her for approximately five minutes. She fought back with her legs. She also told defendant she was menstruating, but he "said he didn't give a fuck." She remembered she was lying down and looking up when defendant had his mouth on her vagina. Meanwhile, defendant was using his hand to hold R.D. down. She continued to try to push defendant away with her legs while he was performing oral sex on her. Defendant then tried to get R.D. to perform oral sex on him, but she fought back. Defendant said that, since R.D. was not "cooperating," he was going to leave. R.D. called 911.

Detective Allison Daniele testified R.D. reported that defendant forcibly orally copulated her, penetrated her vagina with his fingers, and sucked on her breasts. Later, R.D. made a pretext phone call to defendant. A recording of the pretext phone call was played for the jury.

A forensic nurse who examined R.D. testified as an expert in forensic sexual assault examinations. R.D. had an upper arm bruise, wrist abrasions, swelling of her bottom lip, a breast bruise, and a suction injury on her breast. The nurse collected oral swabs, perioral swabs, neck swabs, breast swabs, "four swabs on the outside of the vaginal area which is called the mons pubis," and vaginal swabs. She specified that the mons pubis area is "part of the top of the vaginal area." R.D. testified that she told the nurse who examined her that defendant "threatened [her] with a gun and that he tried to rape [her] with his penis, but he couldn't, so he raped [her] with his fingers and his mouth." She believed she told the nurse that defendant sucked on her breasts.

The prosecution also played a video recording of a detective's interview with defendant. In the interview, defendant acknowledged he undressed R.D., tried to have sex with her, and kissed her. He initially said nothing else happened. He did not

4

remember having oral sex with her. Later, asked if he remembered giving R.D. oral sex, and if she asked for oral sex, he said he did not remember.

Defendant acknowledged, both in the pretext phone call with R.D. and in his interview with the detective, that he was drunk during the incident. He told R.D. during the pretext phone call he did not even recall how he got home afterward. He told the detective he was "fucking drunk," and that he had more than 10 beers that night. Law enforcement obtained a buccal swab from defendant as well as contact samples from his hands and fingernail scrapings.

A criminalist testified as an expert in DNA testing and analysis and performed DNA testing in this case. She testified that there were two contributors to a nonsperm fraction of a swab taken from R.D.'s mons pubis, and it was exceedingly likely defendant was one of the contributors. She could not say whether any of the DNA from the mons pubis swab came from saliva. There were also two contributors to the perioral swab taken from R.D., and, again, it was highly likely defendant was one of the contributors.

*The Defense Case*

Three witnesses testified to defendant's nonviolent character.

*Verdict and Sentencing*

The jury found defendant guilty on all counts, found the firearm enhancement allegations to be true, and found true four circumstances in aggravation. (Cal. Rules of Court, rule 4.421(a)(1), (2), (8), (11).) The trial court dismissed all firearm enhancements other than the one attached to count one. (§ 1385, subd. (c)(2)(B).) The trial court sentenced defendant to an aggregate term of 30 years to life plus 16 years determinate, consisting of consecutive terms of 15 years to life on counts two and three, a determinate upper term of six years on count one, and 10 years on the firearm enhancement. The trial court imposed and stayed an upper term of four years on count four. (§ 654.)

DISCUSSION

I

*Additional Background*

The trial court instructed the jury with CALCRIM No. 200, in part, as follows: "Some words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. . . . Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."

With regard to count three, the trial court instructed the jurors, in part, that oral copulation involves contact "between the mouth of one person and the sexual organ or anus of another person." (CALCRIM No. 1015.)

During deliberations, the jury submitted a note to the trial court asking: "[i]s the female [b]reast considered a sexual organ," and "[i]s the . . . [m]ons [p]ubis considered a sexual organ."

The trial court contacted the parties by e-mail. The trial court noted there had been no evidence pertaining to whether the breast or mons pubis are sexual organs. The trial court indicated it saw two ways to answer the question. It could either refer the jury to the language of CALCRIM No. 200 stating that "[w]ords and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings," or it could answer " 'no' " to each question. The trial court opined that the latter "may border on introducing 'evidence' . . . ."

Defense counsel did not object to either of the trial court's proposed responses. The prosecutor requested a response indicating the mons pubis is part of the female genitalia based on language from a nonpublished case. Defense counsel did not agree with the prosecutor's proposed response.

The trial court and the parties conferred in court. Defense counsel pointed out that the jury's question asked whether the mons pubis was a *sexual organ*, not *genitalia*.

6

Defense counsel also contended that giving the prosecutor's proposed response would amount to placing a "finger on the scale." The trial court declined to give the prosecution's proposed response.

The trial court returned to its proposal to refer the jurors to CALCRIM No. 200. The trial court asked if everyone was "okay with that," and both defense counsel and the prosecutor agreed. Defense counsel subsequently reiterated, twice, that he agreed with the proposed response.

Ultimately, the trial court responded to the jury: "Please refer to Instruction number 200, . . ., which states: Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings." Approximately 20 minutes later, the jury indicated it had reached its verdicts.

## II

### *The Parties' Contentions*

Defendant asserts the trial court prejudicially erred in providing a misleading and nonresponsive answer to the jury's questions. He asserts the female breast and the mons pubis are not sexual organs within the meaning of section 287, and the trial court erred in failing to instruct the jury to that effect. Therefore, defendant maintains his conviction on count three, forcible oral copulation in violation of section 287, must be reversed. Defendant does not raise contentions concerning any other count.

The People respond that defendant forfeited his contention by failing to object and by agreeing with the trial court's proposed response. In any event, the People assert defendant's claim lacks merit because, whether or not defendant is correct that the breast and the mons pubis are not sexual organs within the meaning of section 287, defendant has failed to establish the trial court abused its discretion in instructing the jury to review CALCRIM No. 200.

We conclude the trial court did not abuse its discretion in responding to the jury's questions, and, even if it did, any error was harmless.

7

# III

## *Forfeiture*

Defendant did not object to the trial court's response to the jury's question, and, in fact, agreed with it. These circumstances typically would result in forfeiture. Defendant, however, argues that we may review his claim under section 1259.

Section 1259 provides, in part: "The appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (§ 1259.) "[T]he failure to object to an instruction in the trial court waives any claim of error unless the claimed error affected the substantial rights of the defendant, i.e., resulted in a miscarriage of justice, making it reasonably probable the defendant would have obtained a more favorable result in the absence of error." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) " 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087, quoting *Andersen, supra*, at p. 1249.)

As another court persuasively concluded, "[b]ecause section 1259 directly addresses the issue of waiver of instructional error, it logically follows that it would govern the waiver issue involving a trial court's response to a jury's question implicating a jury instruction, triggering section 1138." (*People v. Kopp* (2019) 38 Cal.App.5th 47, 66, fn. 12, review granted Nov. 13, 2019, S257844, fully briefed, citing *People v. Hillhouse* (2002) 27 Cal.4th 469, 505-506.) Under these circumstances, and in light of defendant's ineffective assistance of counsel claim, we address the merits of defendant's contentions.

*Standard of Review*

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' "  (*People v. Breverman* (1998) 19 Cal.4th 142, 154, disapproved on another ground in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.)

"[S]ection 1138 imposes on the trial court a mandatory 'duty to clear up any instructional confusion expressed by the jury.' "  (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1016.)  " 'When a jury asks a question after retiring for deliberation, ". . . [s]ection 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law." ' "  (*Ibid*.)  "This does not mean the court must always elaborate on the standard instructions.  Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.  [Citation.]  Indeed, comments diverging from the standard are often risky.  [Citation.] . . . .  But a court must do more than figuratively throw up its hands and tell the jury it cannot help.  It must at least *consider* how it can best aid the jury.  It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given."  (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

"An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury."  (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746.)  Under the abuse of discretion standard, we will not disturb a trial court's ruling "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently

9

absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

V

*Abuse of Discretion*

Count three, forcible oral copulation (§ 287), required the prosecution to prove, among other things, that defendant committed an act of oral copulation involving contact "between the mouth of one person and the sexual organ or anus of another person." (CALCRIM No. 1015.) The jury's note asked, "[i]s the female [b]reast considered a sexual organ," and "[i]s the . . . [m]ons [p]ubis considered a sexual organ." As the People argue, even assuming defendant is correct that neither the female breast nor the mons pubis is a "sexual organ" within the meaning of section 287, this does not establish the trial court abused its discretion in its response.

The trial court's response was that the jurors should refer to CALCRIM No. 200 and its directive that "[w]ords and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings." "When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word." (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121-1122; accord, *Hammond v. Agran* (1999) 76 Cal.App.4th 1181, 1189 ["in the absence of specifically defined meaning, a court looks to the plain meaning of a word as understood by the ordinary person, which would typically be a dictionary definition"].) Webster's Third New International Dictionary defines "sexual organ" as "an organ of the reproductive system; *esp*: an external generative organ." (Webster's 3d New Internat. Dict. (1993) p. 2082.) The Oxford English Dictionary defines "sexual organs" as "the organs of sexual generation in animals or plants." (9 Oxford English Dict. (1978) p. 582, col. 1.) With this understanding of the term "sexual organ" in mind, we conclude defendant has not established the trial court abused its discretion in responding to the jury's question.

10

We cannot conclude the trial court's response was wrong or a misstatement of the law, although "a trial court's response to a jury question can be erroneous even if it does not technically misstate the law." (*People v. Fleming* (2018) 27 Cal.App.5th 754, 766.) The trial court's response directed the jury to a means to understand the term "sexual organ," on which the jurors sought clarity. It certainly did not indicate the female breast and the mons pubis *were* sexual organs.

The trial court's response amounted to more than the court "figuratively throw[ing] up its hands and tell[ing] the jury it cannot help." (*People v. Beardslee, supra*, 53 Cal.3d at p. 97.) The record makes clear that the court considered at length how it could best aid the jury. (See *ibid*.) The court proposed two possible responses, considered suggestions from the parties, and entertained argument on the matter. The court sought to avoid any response that, in effect, would direct a verdict or would constitute a substantive response verging on "providing evidence." We conclude the court's response would have aided the jury in its deliberations. Defendant has not established the trial court abused its discretion by referring the jury to the language of CALCRIM No. 200.

VI

*Prejudice*

Even if we concluded the trial court did abuse its discretion in its response, reversal is only warranted if the error was prejudicial. The "law requires us to affirm a jury verdict despite instructional error if the error was harmless." (*People v. Hendrix* (2022) 13 Cal.5th 933, 941.)

Here, defendant argues the purported error constituted a failure to properly instruct the jury on an element of the crime, and therefore the federal standard of harmless error under *Chapman v. California* (1967) 386 U.S. 18, 24, applies. (Cf. *People v. Schuller, supra*, 15 Cal.5th at p. 243 [jury misinstruction that relieves prosecution of the burden to prove an element of the crime violates the federal Constitution].) The People assert any

11

error was harmless under either *Chapman* or the state law standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, which "applies ' " 'to incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error.' " ' " (*People v. Hendrix, supra*, 13 Cal.5th at p. 942.)  We conclude defendant was not prejudiced under any standard.

Under the *Chapman* test, the more rigorous of the two harmless error standards, the "reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 3.) To determine whether the People have satisfied their burden of proving the error was harmless beyond a reasonable doubt, "we examine the entire record and must reverse if there is a ' " 'reasonable possibility' " ' that the error contributed to the verdict." (*People v. Reese* (2017) 2 Cal.5th 660, 671.)  By contrast, under the *Watson* test, " 'a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955; *People v. Watson, supra*, 46 Cal.2d at p. 836.)

Initially, R.D. testified she did not remember if defendant put his mouth on her vagina.  However, after she refreshed her recollection with a police report, she remembered defendant putting his mouth on her vagina.  In fact, she testified defendant performed oral sex on her for approximately five minutes.  She remembered she was lying down and looking up when defendant had his mouth on her vagina.  Defendant was using his hand to hold her down.  She fought back with her legs and told defendant she was menstruating, but he "said he didn't give a fuck."  R.D. continued to try to push defendant away with her legs while he was performing oral sex on her.

R.D. told the nurse who examined her that defendant "raped [her] with his fingers and his mouth."  She also told Detective Daniele that defendant forcibly orally copulated her.  Thus, based on R.D.'s testimony and her statements to the examining nurse and

12

Detective Daniele, there was clear and strong evidence defendant committed forcible oral copulation.

By contrast, there was no evidence contradicting the conclusion defendant committed forcible oral copulation, only defendant's statements to the detective that he could not remember doing so. For example, in his police interview, defendant acknowledged he undressed R.D., tried to have sex with her, and kissed her, although he initially denied doing anything else. He subsequently said he did not remember having oral sex with her. Later, asked if he remembered giving R.D. oral sex, and if she asked for oral sex, he said he did not remember. Defendant acknowledged, both in the pretext phone call and in his interview with a detective, that he was drunk during the incident. He told R.D. during the pretext phone call he could not even recall how he got home afterward. He told the detective he was "fucking drunk," and that he had more than 10 beers that night. Under these circumstances, defendant's statements that he did not remember if he performed oral sex on R.D. did little, if anything, to undermine her testimony and statements that he forcefully orally copulated her against her will.

Based on the totality of the evidence, the language of CALCRIM No. 1015 instructing the jury on forcible oral copulation, and the nature of the trial court's response to the jury's questions, directing the jurors to the language of CALCRIM No. 200, we conclude it is not reasonably possible the trial court's response contributed to the verdict that defendant was guilty of forcible oral copulation on count three. In other words, any alleged error was harmless beyond a reasonable doubt.

# DISPOSITION

The judgment is affirmed.

_____\s\_____,
Krause, J.


We concur:


_____\s\_____,
Hull, Acting P. J.


_____\s\_____,
Mauro, J.