Filed 10/16/24  P. v. Crockett CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E081136 |
| v. | (Super.Ct.No. RIF1805353) |
| KENYATTA K. CROCKETT, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Bernard Schwartz, Judge. Affirmed.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Kenyatta K. Crockett entered into a romantic relationship with Anthony Salcida.[1] Salcida lived in a house located on Jasper Loop in Eastvale (Jasper Loop house) with several other people; he controlled their lives and finances. Salcida warned everyone in the house that if they were with anyone he had ever dated, he would kill them. The victim lived with Salcida and knew the rules. Salcida once had a relationship with Vincent Romero and Romero eventually moved into the Jasper Loop house. Despite Salcida's warning, the victim began a relationship with Romero and they eventually married.

At the beginning of November 2018, the victim and Romero were robbed at a park-n-ride in Corona. Several weeks later, they were sitting in Romero's truck outside his parents' house when a car pulled up and several men, two with guns, emerged from the car. Romero and the victim were able to drive away. During these two incidents, Salcida was in constant contact with defendant, and defendant was near these incidents based on his cellular telephone records.

On November 24, 2018, the victim returned from work to the Jasper Loop house. She took a quick shower and then left to meet up with Romero. During this time, Salcida contacted defendant two times. Defendant, his cohort, or a coconspirator confronted the victim outside her home and shot her six times resulting in her death. Prior to the shooting, defendant had tried to purchase a gun and tried to sell a gun after the shooting.

_____

[1] Salcida also used the names Veronica Lopez and Angel, and sometimes identified as a woman. The reporter's transcript refers to Salcida as "he" and this court will refer to Salcida as a male for purposes of this opinion. Salcida was tried in a separate trial.

Based on cellular telephone records, defendant's cellular telephone was within three miles of the shooting approximately 10 minutes prior to the shooting. In addition, Salcida transferred $2,500 to defendant after the murder, which was an amount discussed in text messages as to what it would cost to "fuck up" a girl. Defendant, a convicted felon, was eventually arrested for driving a stolen car, and ammunition matching the casings found at the shooting of the victim was found in his car. In the first trial, defendant was found guilty of being a felon in possession of ammunition. Defendant was found guilty in a second trial of the first degree murder of the victim and the special circumstance of lying in wait.

Defendant claims on appeal that (1) his conviction in the first trial of being a felon in possession of ammunition must be reversed based on the trial court's erroneous response to a jury question during deliberations that conspiracy principles applied to the charge; (2) the prosecutor elicited improper opinion testimony from the lead detective that defendant was the shooter requiring that his murder conviction be reversed; (3) the trial court erred by failing to instruct the jury with CALCRIM No. 375 on uncharged prior offenses for the park-n-ride and brandishing incidents; and (4) his murder conviction must be reversed because of the cumulative effect of the trial court errors at the second trial.

## FACTUAL AND PROCEDURAL HISTORY

### A.    PROCEDURAL HISTORY

Defendant was convicted in a first trial of being a felon in possession of ammunition within the meaning of Penal Code section 30305, subdivision (a).[2]  The jury was hung on the charge of murder of the victim.  At a second trial, the jury found defendant guilty of the first degree murder of the victim (§ 187, subd. (a)) and the special circumstance that he intentionally killed her while lying in wait within the meaning of section 190.2, subdivision (a)(15).  Defendant was sentenced to state prison for life without the possibility of parole plus two years.

### B.    FACTUAL HISTORY[3]

#### 1.    *THE JASPER LOOP HOUSE*

Salcida ran the Jasper Loop household.  In November 2018, the victim lived with Salcida in the Jasper Loop house.  The victim's daughter Jamie, and the victim's two sisters, Stephanie L. and Daisy L., also lived in the house.  Salcida's mother lived in the house.

Salcida used other names when on social media, including Angel and Veronica Lopez.  Vincent Romero met Salcida online when Salcida was posing as Veronica.  When Romero was 17 years old, Salcida started coming to his house claiming to be Veronica's cousin, and used the name Angel.  Romero moved into the Jasper Loop house

---

[2]  All further statutory references are to the Penal Code unless otherwise indicated.

[3]  Evidence of the charge of possession of ammunition is taken from the first trial. The facts of the murder are from the second trial.

4

in 2014. He shared a room with Salcida and they had a sexual relationship. Romero and Salcida got into verbal fights and Romero would move out. Salcida would threaten him that he was going to hurt his family and Romero felt that he had to move back into the Jasper Loop house.

Salcida required everyone who lived in the Jasper Loop house to work and give him money, including rent money. Salcida paid the bills and bought groceries. Salcida had access to everyone's bank account who lived in the Jasper Loop house. Stephanie, the victim's sister, indicated that Anthony required her to put his name on her cellular telephone and car registration. Daisy described Anthony as being "in control of everything." He had access to her cellular telephone and was on her car registration. She was afraid of him but lived with him because she had nowhere else to live.

Romero helped raise the victim's daughter, Jamie, and Salcida had recommended to Romero that he be a father figure for Jamie. In September 2018, Romero started having romantic feelings for the victim. They started a relationship but kept it a secret from everyone in the Jasper Loop house. Romero moved out of the Jasper Loop house in late September 2018. Romero married the victim on October 26, 2018. When everyone in the Jasper Loop house found out about their marriage, they were not supportive. Daisy was upset at the victim for being with Romero because everyone in the house knew that they were not to have relationships with Salcida's boyfriends. Salcida had threatened to kill anyone who dated his boyfriends. Salcida was "furious" when he found out the victim and Romero were dating.

Defendant lived in Eastvale and dated Salcida.

## 2. *PARK-N-RIDE INCIDENT ON NOVEMBER 9, 2018*

Three weeks prior to the victim's murder, Romero and the victim met at a park-n-ride parking lot in Corona off of Main Street at nighttime. The victim drove her red car to the location and he drove his black truck. The victim parked her car two spots away from his truck and got into his truck. While they were still in the truck, they observed two Black males approach her car. They appeared to be in their late twenties. Romero got out and advised the men to get away from the victim's car. They apologized and claimed to be looking for a similar car that belonged to their boss.

Suddenly, one of the men pointed a black handgun at Romero. Romero was instructed to get into the truck and the man got in with him. The man had the number 54 tattooed on his hand. The victim, Romero, and the gunman all sat in the backseat of the truck, and the other man, who was six feet tall and had a thin build, got into the driver's seat of the truck, drove around the corner and parked in front of a house. The house was in a cul-de-sac in Corona off of Third Street approximately one mile from the park-n-ride. The men took the victim's phone and demanded her password. They also took Romero's phone. They told them they had a message from "Mike," but Romero could not remember the threat. The men took all of their money and keys to the truck; they threatened to hurt their families if they called the police. The two men got into a waiting dark sedan. Since the two men had their identifications, Romero was afraid the men would come to their houses if they called the police. Romero did not tell Salcida what had happened to them. The victim was able to track their phones. She found them up the street from the Jasper Loop house.

On November 9, 2018, at 3:30 a.m., Salcida called the police and reported that the victim was missing. Salcida was at the Jasper Loop house. He called the police from a phone with the number (951) 741-4641. He reported that the victim was his 26-year-old daughter and that she was supposed to be home at 2:00 a.m. but was still not home. He told the dispatcher that her ex-boyfriend had been threatening her. She was not answering her cellular telephone. Sometime later, Salcida called back and reported that the victim had returned home.

3. *BRANDISHING OF WEAPON AT ROMERO'S HOUSE ON*

*NOVEMBER 19, 2018*

Two weeks prior to the murder, on November 19, 2018, Salcida contacted the victim and advised her that he wanted to talk to her. Romero drove the victim to a Starbucks in Norco. They parked and the victim got into Salcida's car. The victim spoke with Salcida for at least one hour. Romero and the victim left the Starbucks at 11:30 p.m. The victim was driving Romero's truck. They returned to Romero's parents' house in Corona; it was located on Suffolk Street where the victim had left her car. Romero was living there at the time. They were parked in the driveway of the house when another car, a white Nissan sedan,[4] pulled up near the house. Several people began getting out of the car. Romero saw that two of them had guns. Romero was fearful and advised the victim to back up the truck and take off. The people got back in the Nissan and followed them.

---

[4] The white Nissan had yellow and orange temporary paper license plates.

7

Romero called 911 while they were trying to get away. He told the dispatcher that he and the victim were being followed. He stated they were at Sienna and Harley Streets in Corona. He said there were three Black males in the white Nissan following them. Romero also told the dispatcher that he and the victim had been robbed two weeks prior and the assailants had threatened to kill them if they called the police. The victim lost the Nissan and they stopped on Stoneberry Street. Romero indicated that one of the men in the Nissan that arrived at his parents' house looked like the man who had been holding the gun at the park-n-ride.

Around 5:00 a.m. the following morning, someone came to Romero's house and started banging on the door with a big rock. He peeked out the window and saw the same white Nissan. There was only one person; he took off.

### 4. *THE SHOOTING ON NOVEMBER 24, 2018*

On November 24, 2018, Romero and the victim planned to meet up after she got off work to look for houses where they could live together. The victim advised Romero she was first going to go back to the Jasper Loop house to take a shower. The victim texted Romero at 8:06 p.m. that she was on her way to meet him. Soon thereafter, Salcida called him and told him that the victim had been shot. Romero went to the Jasper Loop house and saw the victim on the ground.

Adil Mujtaba lived across the street from the Jasper Loop house. He returned to his house around 8:00 p.m. on November 24, 2018. He waited outside for his wife and niece to get in his car to go out to dinner. He observed a woman come out of the Jasper Loop house and get into her car. A person approached her car from the nearby street

8

Aspen Leaf and shot into the car. The shooter was medium height wearing a dark hoodie and dark pants. The person left and headed back to Aspen Leaf. The female opened her door and collapsed on the ground. Mujtaba went to try to help the female. No one came out of the Jasper Loop house to help. When Mujtaba had returned to his home earlier, he observed a car parked at the Aspen Leaf and Jasper Loop intersection but could not describe it.

Riverside County Sheriff's Investigator Vasquez[5] was assigned to investigate the case. He walked through the crime scene. He found six expended nine-millimeter FC Luger shell casings. He also pulled surveillance video from the intersection of Jasper Loop and Aspen Leaf. It depicted the victim arriving home in her car. She remained in the Jasper Loop house for 14 minutes. At 8:00 p.m., a vehicle could be seen in the middle of the intersection of Jasper Loop and Aspen Leaf. The vehicle made a U-turn, turned its lights off, and parked on the north side of Aspen Leaf at 8:02 p.m. At 8:04, the victim exited the Jasper Loop house and got into her vehicle. At this point, an individual could be observed coming from the area where the vehicle had parked on the north side of Aspen Leaf. The person ran up to the window and shot into the car at the victim. The person then ran back toward the waiting vehicle. The shooting occurred at 8:06 p.m. The waiting vehicle could be seen pulling forward and the shooter entered the passenger's side of the vehicle. The vehicle then drove away from the area. The victim exited her vehicle and collapsed on the ground.

---

[5] The jury was advised that despite Investigator Vasquez being a witness, he was allowed to stay in the courtroom as the lead investigator helping the prosecution.

Investigator Vasquez surmised a semiautomatic weapon was used based on the casings being expelled. The shooter's face could not be seen in the video surveillance and it was not clear whether it was a male or female.

At 8:09 p.m. on November 24, 2018, Riverside County Sheriff's Corporal Turner was dispatched to the Jasper Loop house after a report of shots being fired and a woman being shot. He arrived at 8:13 p.m. and observed several people standing by a car; a female was lying on the ground. The victim was on the ground and had blood on her shirt. Corporal Turner called for an ambulance and tried to treat the victim, who had been shot several times. She had a very faint pulse but passed away soon after he arrived. Corporal Turner had a body camera and the footage was shown to the jury. Corporal Turner did not see any vehicles leaving the scene when he arrived.

Riverside County Sheriff's Deputy Roach spoke with Salcida in the garage at the Jasper Loop house on the night of the shooting. He taped the interview. Salcida told Deputy Roach that the victim had been dating a married man named Michael Carney for several years and that he and the others in the Jasper Loop house did not approve of the relationship. The victim sometimes came home with bruises but denied that Carney was hitting her. Salcida also told Deputy Roach that the victim and Romero had gotten married three weeks prior to the shooting. The victim told Salcida on October 16, 2018, that Carney continued to call her and threatened to kill her if she did not give him money. He claimed that he reported the threat to the Corona Police Department but they told him all the victim could do was to get a restraining order. Salcida kicked Romero out of the Jasper Loop house because Romero married the victim behind his back. He claimed he

10

was upstairs in the Jasper Loop house at the time of the shooting and knew nothing about the shooting. He heard the gunshots and ran downstairs.

After the victim's murder, Salcida convinced Romero to go to the victim's work and see if she had a life insurance policy. Investigator Vasquez never found evidence of a life insurance policy. Salcida was in his room upstairs at the time of the shooting and his room did not face the street. Salcida ran downstairs and yelled that the victim had been shot. Investigator Vasquez admitted that nine-millimeter FC Luger ammunition was "semi" common ammunition.

### 5. *INVESTIGATION AFTER ALL THREE INCIDENTS*

Investigator Vasquez interviewed Michael Carney. Carney gave his cellular telephone to Investigator Vasquez and all of the data was downloaded. All of the call records and data were provided to a crime analyst, Sharae Hill. Carney was a truck driver and he provided a bypass log that showed where his truck was on each day when it passed through certain checkpoints. On November 9, 2018, he was in Northern California. On November 20, 2018, he was driving into Arizona and New Mexico. There was no bypass log for November 24, 2018, and he was believed to be in Riverside County. Based on Carney's phone records, he was at his home in Perris at the time of the shooting. Carney did not have a Textnow or Talkatone application on his cellular telephone, which could be used to have another Internet phone number. Carney's cellular telephone records matched the bypass logs.

Investigator Vasquez also obtained call detail records for the cellular phones of Romero, the victim, and defendant. Salcida called 911 on the night of the shooting. The

11

phone number he used was (909) 332-0199 (hereafter, ghost phone). Initially, Salcida did not disclose this additional phone number but Investigator Vasquez discovered it during the investigation. Salcida was arrested on December 17, 2018, and the ghost phone was found on his person. Salcida attempted to open the phone in front of Investigator Vasquez. He entered an incorrect code several times until it locked. The phone was locked for several years but was finally able to be opened to check the data.

The ghost phone was a Samsung Galaxy S9 Plus. Defendant's phone was a Samsung S7 Edge. It had a phone number of (213) 248-1637. Both the ghost phone and defendant's phone had the Textnow application and used an Internet phone number of (951) 842-5174. There were calls between the ghost phone and defendant's (213) phone number on November 19, 2018, the night of the brandishing incident at Romero's house. There were several calls between the phones around 3:00 a.m. on November 20, 2018. There were several calls between the two phones on November 24, 2018, and November 26, 2018, around the time of the murder. There was a call from the ghost phone on the night of the murder at 7:54 p.m. to defendant's phone. The ghost phone next called Romero and then 911.

In reviewing the records for the victim's phone, she was receiving threatening messages from a Textnow phone number (323) 609-8097. Investigator Vasquez obtained all of the records for this phone number. Messages were sent from the number to the victim's phone on November 8, 2018, which said " 'Finna answer bruh dat shit crazy you be gone.' " There was also a message that "Mike" wanted to speak with her. Investigator Vasquez did not believe that the persons texting the victim were working

12

with Carney. The victim responded she did not recognize the number and that if Carney wanted to talk to her he should call from his own phone. A text was sent from the Textnow phone, "He be trying to finna call you and you got my [N] on blocked." There was an exchange of messages that Carney had been the one who decided not to talk to her. A text was sent from this Textnow number to the victim stating that Carney loved her and wanted to give her a ring but she responded that he was already married. The Textnow number sent a message that Carney was no longer with his "baby mama" but she responded he still lived with her. There were threatening messages about knowing where the victim lived and that she should "be on alert real talk." Several other messages were sent that day and evening regarding the victim and Carney getting together and Carney leaving his wife.

This 323 Textnow phone number—which sent threatening messages to the victim's phone—also sent text messages to the (951) 842-5174 number, which was the Textnow number connected to defendant and Salcida on November 9, 2018, the day of the park-n-ride incident. Defendant had another number ((714) 253-4415) which was a Talkatone number connected with his email address and cellular telephone number. The 323 number also sent messages to this Talkatone number. There were other phones that used this Talkatone number but were connected to defendant's email address and used a name connected to him, Mumble.

There were messages sent between the 714 area code Talkatone number and the Textnow number that appeared on phones belonging to defendant and Salcida. On November 8, 2018, at 10:01 p.m., there was a message from the 714 Talkatone number to

13

the Textnow number. First was "Hola," and then "Mumble." Defendant was identified as "Mumble" on Salcida's phone. On the ghost phone, there was a message to defendant, "I love you too, Mumble." There were several other messages sent by Salcida on the ghost phone to defendant's phone in which he referred to defendant as Mumble. There were messages from defendant's Textnow number (951) 842-5174 to the Talkatone number. Defendant's Textnow number sent a message at 10:03 p.m. on November 8, 2018, the night of the park-and-ride incident, to the 714 Talkatone number. The message said that they were just waiting in the car. There was a message that asked about whether there were two or one cars and if they should take "two." There was a message sent at 11:27 p.m. on November 8, 2018: "Don't forget to take everything and hide the phones somewhere." A response at 11:59 p.m. on November 8 stated "Four minutes away." Another message asked "Still there," and then several times, "cut the eyes." On November 9, 2018, at 12:05 a.m. a message was sent "Just chill for a minute. They're parked somewhere." There were messages sent at 12:18 a.m. "still there?"

There were several messages received and sent on the Textnow number associated with defendant. On November 12, 2018, there was a message asking someone if they had "pieces for sale." Another message, "45 or 9" was sent to several numbers. In Investigator Vasquez's experience, this referred to a 45-caliber or 9-millimeter firearm. A 9-millimeter gun was used to shoot the victim.

A message was sent from defendant's Textnow number, asking, "Would you fuck [up] a female for $2,500?" and the response from a person named Tori was, "Hell yeah." A message was sent, "Do you got a piece on you." Messages were also sent to various

14

numbers, "You know anybody who has a piece for sale, 9 or 45?" These messages were sent prior to the shooting of the victim. There were messages sent on November 30, 2018, asking if somebody "needs to buy a throwaway, 9" for 250. Investigator Vasquez stated that a throwaway was either a phone or a gun that someone wanted to dispose of.

There was a call record between defendant's phone, the Samsung Galaxy Edge S7, and the ghost phone. On December 17, 2018, there was a three-hour phone call between the ghost phone and defendant. There was a call at 4:17 p.m., which was the time of a police search at defendant's house. There were several calls between November 11, 2018, and November 15, 2018. There were numerous calls between defendant's phone and the ghost phone found for November 8, 2018, and November 9, 2018, but they had been deleted from defendant's phone. They still appeared on the call record.

There was also a record of text messages between the ghost phone and defendant's phone. Salcida sent a message to defendant on November 5, 2018, to get everything ready for Friday, Saturday or Sunday; the day of the park-n-ride incident was a Friday. Defendant sent messages about meeting with a person named Dodge to discuss the details with him. Defendant sent a message he was meeting with two other persons. On November 9, 2018, at 3:52 a.m. an image of the victim was sent by Salcida to defendant. It was a photograph of her hand. One of her nails was broken. Salcida sent a message to defendant, "Only broke a nail. She's perfectly fine. Fucked up." Defendant asked Salcida to call him. There was a message at 5:25 a.m. to defendant, "I'm so pissed." Salcida texted defendant at 11:26 a.m. on November 9, 2018, "Let me know when you're not busy. I got a plan." On November 10, 2018, defendant asked Salcida if Romero had

15

moved in with him and he responded, "Fuck no." There were messages back and forth that they loved each other. Defendant sent messages to Salcida on November 16, 2018, that he was meeting with several people. Salcida responded, "Oh, okay, good. Yeah, be straight up. Don't hold back. We need shit done. Yo." At 11:28 p.m. on November 19, 2018, defendant texted Salcida that he was at the "215" and "Eastvale." Salcida told defendant that he was "here talking" which was the same time that Romero testified they were at the Starbucks. At 11:29 p.m., Salcida texted to defendant, "Hurry up." Defendant responded he was 20 minutes away. Defendant texted Salcida that he had him saved as Maria on his phone to obscure his identity.

Defendant made several calls to the ghost phone on November 20, 2018, between 4:30 a.m. and 5:30 a.m., the same time someone came to Romero's house and threw a rock at the door. There were several calls and text messages between defendant and Salcida sent on November 24, 2018, the day of the murder. After the murder, they each texted if each other was "good." There was no discussion that the victim had been shot at the Jasper Loop house. They texted each other several times while Salcida was at the police station but there was no mention of the murder. They exchanged text messages about Las Vegas and Salcida's favorite taco place in Las Vegas. At 4:11 p.m. on November 25, 2018, defendant texted that he felt that something was wrong and asked Salcida if he was sure he was good. Salcida responded that he was fine. At 12:52 a.m. on November 26, 2018, he texted Salcida, "What's going on. I feel weird. Now you ignore me all day. You don't respond. What's going on??????" Defendant texted Salcida at 12:37 a.m. on November 26, 2018, "Oh my God. Can you call me? It's an

16

emergency, Verlow. Call me please ASAP. It's an emergency." There were several calls between the phones after this text message. On November 26, 2018, at 4:28 p.m., Salcida sent a text to defendant that he had sent the money.

On November 26, 2018, Salcida transferred $2,500 from his bank account to defendant's bank account. This was the same amount that had been offered to "fuck up a female" in the Textnow message that belonged to defendant and Salcida.

Several text messages were sent between defendant and Salcida after the murder but they never referred to the victim's murder. Salcida sent several messages about not being able to sleep. Defendant texted Salcida on December 17, 2018, at 4:00 a.m., "Police are here." There was a call at 4:00 a.m. from defendant to the ghost phone.

On the day of the victim's murder, she had been working on Binnacle Drive in Dana Point. There was a photograph of the location on the ghost phone. On defendant's phone, there were directions to the Binnacle Drive location.

A search was conducted of defendant's home on December 17, 2018. Defendant was present and his cellular telephone was confiscated. No weapons or ammunition were found. A web search history was performed on defendant's phone. On November 25, 2018, he did a search for news and hotels near his location. He also searched for hotels in Las Vegas. He also did several searches for a deadly shooting of a woman in Eastvale.

Romero could not identify defendant as being involved in the park-n-ride and brandishing incidents. Stephanie, the victim's sister, was aware that Salcida had put a tracker on the victim's car prior to her murder. He also tracked all of their phones. Daisy, the victim's other sister, stated that Salcida had purchased two trackers and had

17

her register them. She registered one of the trackers on November 1, 2018. She observed Salcida put one of the trackers in Romero's truck and the other in the victim's car. Salcida could track the location of the victim and Romero at all times. Salcida claimed to be tracking them to see if it was true they were dating. Investigator Vasquez found a tracker hidden in the victim's car. A tracker was also found hidden in Romero's truck.

Daisy was with Salcida on December 17, 2018, when he received a phone call from someone and it sounded like the person was having their home searched. Salcida advised the person to "get rid of everything" or leave. Salcida told Daisy before she spoke with the police not to say anything about the trackers.

Investigator Vasquez monitored a jail call from defendant to Salcida. Salcida asked defendant "what did they get you, for?" Defendant responded, "Um, a stolen car, checks." Salcida stated, "That's all?" Defendant stated, "Well, for now, but I mean I don't know they have the car, but." Salcida asked, "Was there other stuff in the car?" Defendant responded his and his mother's belongings were in the trunk. He insisted that he refused to talk to the police who stated there were several open cases on him. Salcida offered to help him with bail money. Veronica Lopez bailed defendant out.

Corona Police Officer Tizcareno worked patrol. He arrested defendant on December 4, 2018, while he was driving a white Nissan Versa. The Nissan had paper plates. Defendant could not produce his driver's license. The Nissan came back as stolen and defendant was arrested. The Nissan was impounded.

A box of 139, nine-millimeter FC Luger ammunition rounds was found in the trunk of the Nissan. These were the same types of shell casings found at the scene of the

18

victim's murder. There were also several items bearing defendant's name but there were also items belonging to other persons found in the trunk.

Sharae Hill was a crime analyst supervisor at the Riverside County Sheriff's Department. She had received training on mapping out cell phone towers and how data is sent to the towers to determine the location of a cellular telephone. She analyzed call detail records for defendant, Carney, the victim, and Romero. She was also given GPS tracker information from the cars belonging to the victim and Romero.

On November 8, 2018, and November 9, 2018, at 11:20 p.m., Romero's truck was at Stagecoach Park until 12:04 p.m. At 12:05 a.m., defendant's phone was approximately one mile from Stagecoach Park. From 12:26 a.m. to 1:07 a.m., Romero's truck was at the park-n-ride. Defendant's phone was nearby. Between 2:13 a.m. and 3:30 a.m., Romero's tracker showed he went to several places including Joy Street and Romero's home. Carney's phone had no activity. Defendant's phone was near the park-n-ride at 11:46 p.m. but appeared to be driving away from it at 12:05 a.m. Later calls also showed him driving further away.

Hill analyzed the records from November 19, 2018, at 6:00 p.m. until November 20, 2018, at 6:00 a.m. Carney's cellular telephone was in Texas. Romero's truck was at his residence from 12:01 a.m. until 12:08 a.m.; it left at 12:09 a.m. and ended up on Stoneberry Lane. Defendant's cellular telephone showed up prior to 12:08 a.m. at places where Romero's truck was located. Defendant's phone was near the Starbucks where Salcida and the victim were talking prior to the brandishing incident. At 11:53 p.m. defendant was traveling westbound on California State Route 91 from Riverside to

19

Corona. It was approximately eight miles from Romero's residence. No other data showed where the phone was located.

On November 24, 2018, at 6:00 a.m., the victim drove from the Jasper Loop house to Dana Point. She was there until 6:49 p.m., and she returned to the Jasper Loop house at 7:52 p.m. From 1:47 p.m. to 2:28 p.m., defendant's cellular telephone pinged off a tower in Dana Point about one-half mile from the Binnacle address. At 7:45 p.m., defendant's phone was near California State Route 91 and Tyler Street in Riverside. At 7:54 p.m., it was near River Road and Second Street by the 15 freeway in Corona. This was 3.1 miles south of the Jasper Loop house. Carney's cellular telephone never registered close to the Jasper Loop house. At 7:53 p.m., Romero's truck was at his residence and he arrived at the Jasper Loop house at 8:16 p.m. There was a call from the ghost phone to defendant's phone at 7:54 p.m. The victim's cause of death was six gunshot wounds.

F.     *FELON IN POSSESSION OF AMMUNITION—FIRST TRIAL*

Corona Police Officer Tizcareno was working traffic patrol on December 4, 2018. He was sitting at the onramp of California State Route 91 monitoring cars making illegal right turns. He pulled over a white Nissan Versa. Defendant was driving the Nissan and there was a person in the passenger's seat. Defendant's driver's license was suspended. Defendant was arrested for an unrelated crime. The Nissan was impounded and stored at a secure tow yard. The Nissan was eventually released to the dealership, Nissan Riverside.

Carlos Sanchez was an auto mechanic. In December 2018 he worked at the Nissan Riverside car dealership. He was in charge of cleaning out used cars and fixing them up in order to sell them. Any items left in the car from the previous owner were placed in a box for the prior owner to claim. He inspected a Nissan Versa that had been impounded. Sanchez found a box of ammunition in the trunk of the Nissan. There was also a lot of trash in the trunk that was on top of the ammunition. Sanchez gave the box of ammunition to his supervisor, John Guthrie. No casings or bullets were found in the passenger compartment of the Nissan.

Corona Police Investigator Manajarez retrieved the ammunition from the Nissan dealership. He was given the box of ammunition, which consisted of nine-millimeter FC Luger rounds. Items with the names Mattron Brown and Dennell Frison were found in the trash collected from the Nissan. An orange vest was also found with the name Orlando.

Michael Ossyra was the service manager at Nissan Riverside. A person came to the dealership to collect the items from the Nissan but could not be identified. Corona Police Investigator Gomez reviewed surveillance video from Nissan Riverside. The person who picked up the belongings resembled defendant. The parties stipulated that defendant was convicted of a prior felony offense on November 1, 2018.

7.    *DEFENSE*

Isabel Rojas stated that defendant was a tenant in her home located on Harrow Street in Eastvale. He lived there from 2016 until December 2018. The police searched the house in December 2018. He drove a Toyota but she did not recall the color. He had

21

another car that was light blue.  No one ever came to the house to visit defendant.  She never saw defendant with ammunition or a gun.

Defendant's father, Tyrone Crockett testified that in 2018, defendant owned a black Toyota Camry.  He also drove a white car.  Defendant never mentioned Salcida to him.  Defendant did reference Veronica as being his girlfriend.

Investigator Vasquez testified that defendant had no tattoos on his hands.

## DISCUSSION

### A.     FELONY POSSESSION OF AMMUNITION

Defendant contends his conviction of being a felon in possession of ammunition must be reversed based on the trial court erroneously advising the jury during deliberations that it could find him guilty of count 2, felon in possession of ammunition, based on conspiracy principles.  Specifically, the trial court interpreted the jury's question "Does conspiracy apply to all of the charges [defendant] is accused of" to be whether all the evidence concerning a conspiracy could be used to convict him of both the murder and felon in possession of ammunition.  Defendant contends the jury question was requesting whether conspiracy principles could be used to find him guilty of being a felon in possession of ammunition as charged in count 2.  The answer to the jury allowed it to convict defendant based on a coconspirator possessing the ammunition, a violation of his federal constitutional rights.

### 1.     *FURTHER BACKGROUND FACTS*

During a discussion of the instructions for the first trial, the trial court noted that the conspiracy included purchasing a firearm, purchasing or providing ammunition, the

22

offer of $2,500, and following the victim to Dana Point and back. The jury was instructed on conspiracy to commit murder. They were advised that in order to find defendant was part of a conspiracy, they must find that he agreed with Salcida to commit murder; at the time of the agreement, defendant or one or more of the other alleged members of the conspiracy intended that one or more of them would commit murder; and defendant, Salcida, or the other members committed one or more overt acts to accomplish murder. These overt acts included purchasing a nine-millimeter firearm, obtaining nine-millimeter FC Luger ammunition, offering or paying $2,500 to commit a murder, and following the victim to Dana Point and back to Eastvale.

The jury was also instructed with CALCRIM No. 2591 on the possession of ammunition. The jury was instructed that in order to be found guilty of unlawfully possessing ammunition, the jury must find that "One, the defendant possessed or had under his custody or control ammunition; two, the defendant knew he possessed or had under his control or custody the ammunition; and, three, the defendant had previously been convicted of a felony." During closing argument, the prosecutor argued that the ammunition was found in defendant's trunk. Defendant's counsel questioned who put the ammunition in the trunk and there was no evidence that defendant was aware it was in the trunk.

During deliberations, the jury requested a readback of Sanchez's testimony. He had testified regarding the search of the trunk of the Nissan. The jury then sent out a note asking, "Does conspiracy apply to all of the charges [defendant] is accused of." Defense counsel stated, "Regarding the conspiracy charge, conspiracy theory for Count 2, I'm

23

having a little bit of problems with it. The problem I have is two things: First of all, the jury instruction only lists conspiracy as to the murder. The second issue, [defendant] is the only co-conspirator that has a felony conviction as far as we know about. There's no evidence that Anthony Salcida has a felony conviction; there's no evidence that any other co-conspirator had a prior felony conviction." Defense counsel believed the jury was concerned that defendant did not know about the ammunition in the car. If another coconspirator possessed the ammunition and did not have a prior felony, that person may be entitled to possess the ammunition. The trial court noted that the jury had been instructed that obtaining the nine-millimeter FC Luger ammunition was an overt act as part of the conspiracy. Further, the trial court stated, "So I don't necessarily disagree with you, [defense counsel]. There certainly is a requirement that possessing the ammunition requires some illegal act of having it. And in your case, in your client's case, he has a felony conviction.· But that's separate and apart from whether or not they can consider the entirety of the conspiracy with respect to the count. And the jurors were instructed that conspiracy applies with respect to that act." The trial court agreed that someone could have purchased the ammunition and put it in the trunk. "Your client would have to have knowledge, clearly, or possession of the ammunition in order for him to be guilty of it. That's a separate issue. But to the extent somebody else got it, sold it to him, transported it somewhere, or was also in constructive center possession, I think that they can consider that in the totality of all of the conspiracy allegations." The trial court did not think that the jury was asking specifically about count 2, the felon in possession of ammunition charge, but rather "whether or not they can consider the

24

totality of the conspiracy in the case, in all charges, and I think the answer to that is yes as it relates to obtaining the ammunition and possessing it."

The trial court noted that the jury was also instructed with CALCRIM No. 2591 which required the jury to find that he possessed or had the ammunition under his control. The trial court again stated that the jury was "not really requesting specifically as to Count 2 what I think you're reading into it." The trial court concluded, "I think you might [be] reading a little too much into the question they're asking. I think all they really want to know is whether or not all of the surrounding circumstances can be utilized in determining guilt or innocence on Count 2. And I think the answer to that is yes, given the circumstances of the case, including one of the overt acts being alleged as the obtaining of that ammunition." The trial court responded to the question as, "Yes."

2.    *ANALYSIS*

Section 1138 provides, "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." "When a jury asks a question after retiring for deliberation, '[s]ection 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law.' [Citation.] But '[t]his does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional

25

explanations are sufficient to satisfy the jury's request for information.' " (*People v. Eid* (2010) 187 Cal.App.4th 859, 881-882 (*Eid*).)

"We review for an abuse of discretion any error under section 1138." (*Eid*, *supra*, 187 Cal.App.4th at p. 882.)

The trial court did not improperly respond to the jury's question. As noted by the trial court, the jury could consider, in finding defendant guilty of murder, the overt act that a coconspirator obtained the ammunition to commit the murder. The jury did not necessarily have to find that defendant purchased the ammunition for the felon in possession charge. The jury did not ask whether it could find defendant guilty of being a felon in possession of ammunition in count 2 based on conspiracy principles. Rather, the jury asked whether "Does conspiracy apply to all of the charges [defendant] is accused of." This question was reasonably interpreted by the trial court to apply to all of the evidence surrounding obtaining the ammunition, which was alleged as an overt act for the murder conviction in addition to the felon in possession of ammunition charge. We cannot find that the trial court abused its discretion in simply responding "yes" to the jury's question.

Further, there was no prejudice. Based on the totality of the instructions, the jury necessarily concluded that defendant was guilty of being a felon in possession of ammunition based on the ammunition being found in his trunk and not based on a coconspirator obtaining and possessing the ammunition. "A violation of section 1138 warrants reversal only upon a showing of prejudice." (*People v. Fleming* (2018) 27 Cal.App.5th 754, 768.) Normally a trial court's failure to adequately answer a jury's

26

question during deliberations is subject to prejudice analysis under *People v. Watson* (1956) 46 Cal.2d 818, 836, which requires this court to "evaluate whether the defendant has demonstrated that it is ' "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*People v. Gonzalez* (2018) 5 Cal.5th 186, 195; *People v. Eid*, *supra*, 187 Cal.App.4th at p. 882.) Defendant insists that the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 applies because the instruction omitted or misdescribed an element of the charged offense in violation of his right to a jury trial guaranteed by our federal Constitution. (See *People v. Fleming*, *supra*, 27 Cal.App.5th at p. 768.) Here, we find the trial court's response to the jury's inquiry regarding conspiracy was not prejudicial under either the *Chapman* or *Watson* standards.

The instructions as a whole instructed the jury that it could find defendant guilty of murder based on conspiracy principles. It was further instructed that in order to find him guilty of being a felon in possession of ammunition, it had to find that "defendant" possessed or had under his custody or control ammunition, and that "defendant" knew he possessed or had under his control or custody the ammunition. Most importantly, the jury was instructed that they must find that "defendant" had previously been convicted of a felony in order to be found guilty of being a felon in possession of ammunition. They were not advised that other persons who were part of the conspiracy had felony convictions. We " ' "assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1013.) The jury necessarily had to conclude that defendant,

27

a convicted felon, knew he possessed the ammunition in the trunk of the Nissan in order to be found guilty of count 2. Reversal based on the trial's court response to the jury during deliberations is not warranted as defendant has failed to show error or prejudice.

B. OPINION TESTIMONY OF LEAD DETECTIVE

Defendant insists the prosecutor presented three theories of liability for the murder of the victim: shooter, aider and abettor to the shooter, or as a coconspirator. The easiest determination was for the jury to find him guilty as the shooter. The prosecutor committed misconduct by eliciting improper opinion testimony from Investigator Vasquez that, based on the cellular telephone records, he believed that defendant was at the shooting scene, and hence, he was the shooter. Defendant's arguments regarding prosecutorial misconduct and ineffective assistance of counsel all rely on the presumption that Investigator Vasquez provided improper opinion evidence that invaded the province of the jury by advising the jury that defendant was the shooter. Initially, this claim is waived based on the failure of defendant's counsel to object to Investigator Vasquez's testimony. In an effort to avoid this waiver, defendant contends that his counsel's failure to object to the opinion testimony and the prosecutor's misconduct in eliciting the opinion constitutes ineffective assistance of counsel.

1. *ADDITIONAL FACTUAL BACKGROUND*

During the cross-examination of Investigator Vasquez, defendant's counsel asked if he had ever driven from the last cellular telephone tower that defendant's phone pinged off of at 7:54 p.m. on the night of the murder, to the Jasper Loop house, the site of the murder, to see how long it would take. He had not. Investigator Vasquez noted that it

was impossible to determine a certain time based on traffic conditions, lights, and speed of the vehicle. Defense counsel then asked Investigator Vasquez if there was any "physical evidence" that put defendant at the shooting scene, and he responded no.

On redirect examination, the following exchange occurred:

Prosecutor: "Well, what do you mean by—what's your understanding of physical evidence.

[Investigator Vasquez:] Physical evidence would be something like, you know, DNA or something tangible; essentially, something actually physical that would be at the scene.

[Prosecutor:] Do you have any evidence that [defendant] was at the location where [the victim] was shot?

[Investigator Vasquez:] Do I have—yes. I believe the cell records show that.

[Prosecutor:] Okay. Cell records. What about the casings?

[Investigator Vasquez:] The casings that were at the scene do match the casings taken from his vehicle.

[Prosecutor:] Do you believe Anthony Salcida has anything to do with the murder?

[Investigator Vasquez:] Yes, I do."

Investigator Vasquez believed that Salcida was the mastermind behind the murder of the victim. The prosecutor inquired, "Okay. And Anthony Salcida's being the mastermind on the day of the murder, who did Anthony Salcida communicate with several times—solely up until the time of the murder?" Investigator Salcida responded

29

defendant, and the prosecutor asked, "Is that evidence that [defendant] was there at the location where [the victim] was shot?" Investigator Vasquez responded, "I believe it is." Investigator Vasquez also believed that defendant was involved based on evidence that he tried to purchase a gun prior to the murder, he tried to sell a gun after the murder, and he received $2,500 from Salcida. Defendant's counsel never objected to the testimony.

On further cross-examination, the following exchange occurred:

"[Defense counsel:] It's just your opinion; right?

[Investigator Vasquez:] Yeah, through my training and experience. Yeah, that's how I form my opinion.

[Defense counsel:] It's based on certain assumptions; right?

[Investigator Vasquez:] Some. [¶] . . . [¶]

[Defense counsel:] So if your assumptions aren't true, then your opinion changes, potentially, right?" There was an objection and no response.

## 2. *WAIVER*

Defendant's counsel did not object to the statements made by Investigator Vasquez or the questioning by the prosecutor. "Defendant did not raise this objection at trial, and therefore he forfeited the issue." (*People v. Navarette* (2003) 30 Cal.4th 458, 515.) Defendant's failure to object in the lower court to the admission of the evidence waives the issue on appeal.

### 3.        *INEFFECTIVE ASSISTANCE OF COUNSEL*

In order to avoid waiver of the issue on appeal, defendant claims that his counsel was ineffective for failing to object to this testimony as there was no tactical reason not to object to the improper testimony, and its admission was prejudicial.

"In deciding ineffective assistance, we determine whether counsel's failure to object fell below the standard required for reasonably competent attorneys and whether counsel's performance was prejudicial to the defendant's case." (*People v. Julian* (2019) 34 Cal.App.5th 878, 888, citing to *Strickland v. Washington* (1984) 466 U.S. 668, 686-692.) Initially, there was a tactical reason possessed by defendant's counsel in not objecting to the testimony: the evidence was admissible.

Expert opinion testimony is limited to an opinion that is "[r]elated to a subject that is sufficiently beyond common experience that [it] would assist the trier of fact." (Evid. Code, § 801, subd. (a).) "Despite the circumstance that it is the jury's duty to determine whether the prosecution has carried its burden of proof beyond a reasonable doubt, opinion testimony may encompass 'ultimate issues' within a case." (*People v. Prince* (2007) 40 Cal.4th 1179, 1227.) "On the other hand, '[e]xpert opinion is not admissible if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness.' " (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506.) "[A]n expert's opinion that a defendant is guilty is both unhelpful to the jury—which is equally equipped to reach that conclusion—and too helpful, in that the testimony may give the jury the impression that the issue has been decided and need not be the subject of deliberation." (*Prince*, at p. 1227.)

31

Here, defense counsel inquired of Investigator Vasquez whether there was any physical evidence connecting defendant to the murder scene. Investigator Vasquez was then asked by the prosecutor the definition of physical evidence, and then was asked if there were other types of evidence that placed defendant at the shooting scene. Investigator Vasquez then expressed what evidence he believed showed defendant was at the shooting scene, including the cellular telephone records. At no time did Investigator Vasquez advise the jury that defendant was the shooter. This testimony was properly admitted.

Defendant relies on *People v. Rouston* (2024) 99 Cal.App.5th 997 (*Rouston*), to support this claim that Investigator Vasquez's testimony was improperly admitted.

In *Rouston*, the defendant was alleged to have been in a white car with a fellow gang member and they both fired shots at the victim. Witnesses testified that there were two persons in the car that shot at the victim. (*Rouston*, *supra*, 99 Cal.App.5th at pp. 1002-1003.) Both guns were recovered, and DNA tests were performed on both guns, but no conclusive evidence was found linking either of the guns to the defendant. The lead investigator testified based on his training and experience that the defendant had fired the gun that resulted in the victim being shot. (*Id.* at pp. 1004-1005} On appeal, the defendant claimed that the trial court erred by allowing the lead investigator to testify that based on the witness testimony, the defendant shot the victim, which was the ultimate decision to be made by the jury. (*Id.* at p. 1006} The appellate court found error where based on the lead investigator being asked " 'based on the witness testimony' " who he believed the shooter was, and the detective, over objection stated he believed it was the

32

defendant. (*Id.* at p. 1012.) The *Rouston* court found reversible error in part because " 'the jury had every reason to look to [the detective] as a far better judge than they could be' regarding the reliability of other witnesses' testimony, and what inferences to draw from the prosecution's other evidence." (*Ibid.*) The court concluded the admission of the detective's testimony by the trial court over objection was an abuse of discretion because it "usurped the jury's role." (*Ibid.*) The court found the error prejudicial because the opinion "bolstered the witness testimony that favored the prosecution and minimized the inconsistencies in that evidence." (*Id.* at p. 1018.)

*Rouston* is factually distinguishable. Initially in this case Investigator Vasquez was asked these questions in response to cross-examination by defendant's counsel that there was no physical evidence that defendant was involved in the shooting. The questions to Investigator Vasquez were directed to identifying the evidence that he believed connected defendant to the shooting of the victim. Moreover, unlike in *Rouston*, the testimony did not conclusively establish defendant's guilt. Investigator Vasquez never stated that because, in his opinion, the cellular telephone evidence showed that defendant was in the area, and that defendant was the shooter. The evidence established that there were two persons in the car near where the victim was murdered, and it was up to the jury to determine if defendant was the shooter. Similarly, by stating his opinion that the telephone records placed defendant at the scene, it did not usurp the role of the jury to determine whether defendant had the intent to kill required for a conviction as an aider and abettor or as coconspirator. Here, the jury had to determine that defendant was

33

the shooter, or whether he had the intent to kill, in order to find him guilty. Defendant's counsel had no grounds to object to the admission of the evidence.

In addition, the admission of the evidence was not prejudicial to defendant as there is no reasonable probability of a more favorable outcome had the testimony been excluded. (*People v. De Hoyos* (2013) 57 Cal.4th 79, 131; *People v. Watson, supra,* 46 Cal.2d at p. 836.)

As stated above, the testimony did not usurp the jury's determination of guilt and was properly admitted. Investigator Vasquez opined that there were several pieces of circumstantial evidence showing defendant was at the scene of the shooting, including the cellular telephone records. This was in response to questions by defense counsel on cross-examination that there was no physical evidence tying defendant to the victim's murder. Investigator Vasquez properly explained to the jury that circumstantial evidence, like the phone records, tied defendant to the murder scene. Even with Investigator Vasquez's testimony, the jury still had to determine if defendant was the actual shooter as there was no opinion proffered by him that defendant was the shooter.[6] If it rejected that theory, it then had to determine that he had the intent to kill the victim under a theory of aiding and abetting or conspiracy.

---

[6] In the reply brief, defendant appears to claim that the testimony did identify defendant as the shooter "because there was only one person at the murder scene." Investigator Vasquez never gave his opinion that defendant was the person who approached The victim. He only opined that defendant was near the murder scene based on the cellular telephone records, which did not pinpoint his exact location. The evidence clearly established there was a driver and a passenger that night in the car parked near The victim's car and Investigator Vasquez never opined that defendant had to be the shooter.

Moreover, the evidence supporting defendant's guilt was strong. Defendant had a relationship with Salcida who according to the evidence was the mastermind behind the shooting of the victim. Salcida and defendant exchanged numerous messages during the shooting, the park-n-ride incident, and the brandishing at Romero's home. Defendant followed the victim to her work in Dana Point on the day of the murder and there was no explanation for him being near her work on that day. Defendant was arrested with the same ammunition as was found at the scene of the shooting. He received $2,500 from Salcida the day following the shooting, which was the same amount discussed in a text conversation about the cost to "fuck up a female." Defendant sent out messages seeking to purchase a gun prior to the shooting, and then tried to sell a gun after the shooting. Defendant fled to Las Vegas immediately following the shooting and searched the Internet numerous times regarding a shooting in Eastvale. This evidence strongly established that defendant was the shooter, or aided and abetted the shooter, or was part of the conspiracy to kill the victim.

Based on the entirety of the evidence, defendant cannot establish that there was a reasonable probability he would have received a more favorable outcome without Investigator Vasquez's testimony. Defendant has failed to show he received ineffective assistance of counsel.

C.    <u>FAILURE TO INSTRUCT WITH CALCRIM NO. 375</u>

Defendant insists the trial court erred by failing to instruct the jury with CALCRIM No. 375 on how to use the uncharged prior offenses of the park-n-ride incident and the brandishing incident at Romero's house.

35

## 1. *ADDITIONAL FACTUAL BACKGROUND*

Prior to the first trial, defendant decided to represent himself. While representing himself, he filed a motion in limine to prohibit the use of prior bad acts. Just prior to the first trial, defendant chose to be represented by counsel. Defense counsel filed further motions in limine, which included exclusion of all Evidence Code section 1101, subdivision (b), evidence. Prior to the first trial, the trial court addressed the motions in limine. The prosecutor noted that the park-n-ride and brandishing incidents could possibly fall under Evidence Code section 1101, subdivision (b). The trial court noted that there were a number of theories upon which the evidence could be introduced, including to establish a conspiracy. The trial court found the evidence should not be excluded under Evidence Code section 352. The evidence was more probative than prejudicial in order to establish a conspiracy and defendant's involvement. The trial court also stated, "If so, then 375 will be read to the jurors with the appropriate means in which they can take the evidence. To the extent that it's not, it can come in for obviously other purposes." The prosecutor laid out all the evidence that tied defendant to the prior two incidents. The trial court reiterated that the evidence could come in under several theories including identity and conspiracy. The parties agreed that the matter would be discussed further during the jury instructions. There was no request for CALCRIM No. 375 at the first trial.

Prior to the second trial, defendant's counsel filed motions in limine that included exclusion of Evidence Code section 1101, subdivision (b), evidence. The parties agreed that the arguments made prior to the first trial would be incorporated into the second trial

and no further argument on the admission of the two incidents was discussed by the parties. At the time that the parties discussed the instructions at the second trial, no request for CALCRIM No. 375 was made.

2.    *ANALYSIS*

Defendant acknowledges that there was no request made in the lower court that the jury be instructed with CALCRIM No. 375 but contends the trial court had a sua sponte duty to instruct the jury. He insists that the two prior uncharged offenses were a "dominant part" of the prosecution's case and were "minimally relevant" to any legitimate purpose. The jury should have been instructed with CALCRIM No. 375, which applies to evidence admitted pursuant to Evidence Code section 1101, subdivision (b), that the evidence should be disregarded in its entirety if the prosecution had not proven that defendant committed the prior crimes by a preponderance of the evidence; the limited purposes for which the evidence could be used; and that the evidence was not admissible to show he had a criminal disposition. He further contends if this court finds there was no sua sponte duty to so instruct the jury, and that he waived the claim by failing to request instruction, that he received ineffective assistance of counsel due to his counsel's failure to request the instruction.

CALCRIM No. 375 provides instruction on evaluating other act evidence for the limited purpose of deciding whether the defendant had a certain intent, motive, identity, or common plan. It instructs the jury to consider the evidence only "if the People have proved by a preponderance of the evidence that the defendant in fact committed" the uncharged offenses and that it must be disregarded entirely if not proven. It further

37

provides that the jury is not to consider the evidence for any other purpose and not to conclude from the evidence that the defendant "has a bad character or is disposed to commit crime."

In *People v. Collie* (1981) 30 Cal.3d 43, the California Supreme Court held, "[I]n general, the trial court is under no duty to instruct sua sponte on the limited admissibility of evidence of past criminal conduct." (*Id.* at p. 64, fn. omitted.) The court recognized the following exception to this general rule: "There may be an occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose. In such a setting, the evidence might be so obviously important to the case that sua sponte instruction would be needed to protect the defendant from his counsel's inadvertence." (*Ibid*)

Here, the park-n-ride incident and brandishing were primarily introduced to establish that defendant was part of the conspiracy. This was not the extraordinary case in which the trial court had a sua sponte duty to give CALCRIM No. 375. The evidence was not "minimally relevant" to any legitimate purpose as the prosecutor argued at length that this evidence was relevant to show the conspiracy. The trial court did not err in failing to sua sponte instruct the jury with CALCRIM No. 375. Further, defendant's failure to request the instruction waives the issue on appeal.

We next consider defendant's claim that he received ineffective assistance of counsel for failing to request CALCRIM No. 375. "In deciding ineffective assistance, we determine whether counsel's failure to object fell below the standard required for reasonably competent attorneys and whether counsel's performance was prejudicial to the defendant's case." (*People v. Julian*, *supra*, 34 Cal.App.5th at p. 888.)

As stated by the People, there was a valid tactical reason for defense counsel not to request CALCRIM No. 375 as such an instruction would have directed the jury to another use of the prior incidents, specifically, to prove identity. There is no dispute the evidence was admissible to prove that defendant was involved in the conspiracy. If the jury was instructed with CALCRIM No. 375, it would have also considered the evidence in order to show intent and/or identity. Defense counsel had a valid tactical reason to not highlight this use of the evidence.

Moreover, had the trial court given CALCRIM No. 375, it is not reasonably probable that the result would have been different. "[C]laims of instructional error are examined based on a review of the instructions as a whole in light of the entire record." (*People v. Lucas* (2014) 60 Cal.4th 153, 282, overruled on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.)[7] Here, the jury was instructed on the conspiracy to commit murder and in closing argument the prosecutor referred to the prior

---

[7] Defendant contends that the instructional omission lightened the prosecution's burden in violation of his Fourteenth Amendment due process rights. The error in failing to instruct the jury should be assessed under the *Chapman* beyond a reasonable doubt standard. However, this court has found that there was no sua sponte duty to instruct and is evaluating the claim as ineffective assistance of counsel in which the well-established standard is reasonable probability of a more favorable result.

incidents in the timeline of the conspiracy to commit the victim's murder. Defendant's counsel argued that the perpetrators of the park-n-ride incident and brandishing were friends of Carney. At no time was the jury instructed nor did the prosecution argue that because of defendant's involvement in the prior two uncharged incidents, it could be considered evidence of his identity, intent, common plan or motive as to the murder. The sole purpose of the prior uncharged conduct was to show the conspiracy between Salcida, defendant and other cohorts. Moreover, as stated *ante*, there was strong evidence that defendant was guilty of murder under all three theories; instruction with CALCRIM No. 375 would not have changed the result in this case.

D.    CUMULATIVE ERROR

Defendant contends that the two errors in the second trial—the opinion testimony of Investigator Vasquez and the admission of the uncharged prior incidents without instruction with CALCRIM No. 375—cumulatively denied his Fourteenth Amendment right to a fair trial. 'Under the cumulative error doctrine, the reviewing court must "review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to [the] defendant in their absence." [Citation.] When the cumulative effect of errors deprives the defendant of a fair trial and due process, reversal is required.' " (*People v. Doane* (2021) 66 Cal.App.5th 965, 984.) In this case, we have found that the trial court did not commit any errors at the second trial and there was no prejudicial ineffective assistance of counsel. As such, defendant's cumulative error argument fails.

## DISPOSITION

The judgment is affirmed in full.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


MILLER
                                                     Acting P. J.

We concur:


CODRINGTON
                        J.


FIELDS
                        J.